THE CLEVELAND ELECTRIC ILLUMINATING COMPANY, APPELLEE, *v.* VILLAGE OF MAYFIELD ET AL., APPELLANTS.

[Cite as Cleveland Electric Illuminating Co. v. Mayfield (1977), 53 Ohio App. 2d 37.]

38

(Nos. 36070 and 36074—Decided July 14, 1977.)

*Messrs. Squire, Sanders & Dempsey, Mr. Alan P. Buchmann* and *Mr. Thomas S. Kilbane*, for appellee.
*Messrs. Hull & Hull*, for appellant Aintree Park Home-owners Assn.
*Speith, Bell, McCurdy & Newell Co., L. P. A., Mr. Phillip J. Campanella*, and *Mr. Lawrence I. Byrnes*, for appellant Village of Mayfield.

PRYATEL, J. The Cleveland Electric Illuminating Company (CEI) is a regulated public utility which provides electric service throughout northeastern Ohio. It is constructing an electric transmission line and a substation which will convert electricity carried in bulk to voltages suitable for distribution to consumers in eastern Cuyahoga County along Interstate 271.

This project passes through a portion of the village of Mayfield (appellant herein) which was a non-charter municipality until January 1, 1975. The company is in the process of building through the village a 138 kv double circuit transmission line (known as the "Lark Line") on single steel pole supporting structures and a dependent substation (known as the "Lark Substation") to be located at the intersection of Interstate 271 and Wilson Mills Road. The project extends from Bedford Heights in the south to Eastlake in the north, running along I-271, with a series of substations along the route. Its purpose is to answer the increasing needs for electric energy in the area.

In 1969, CEI approached the village officials concern-

ing the location of the substation site. At the request of the village, the company selected the site at the intersection of I-271 and Wilson Mills Road. The village had previously refused to issue a permit for a service (gas) station here (which was a permissible use) preferring to have the substation located at this site (which was a nonpermissible use) thus requiring a variance. Again, upon the advice of the village officials, the company and the landowner applied for a variance to allow for the construction of an electric substation at the site. The variance was granted in 1970 and provided that "all plans and specifications for all buildings and structures thereon shall be approved by the Planning and Zoning Commission and the Architectural Board of Review."

After the variance was allowed the company purchased the property at a substantial cost. Since the location of the substation was to be on the east side of I-271, CEI decided to build the transmission line which would serve the substation on the easterly side of the interstate area. Rights-of-way were then acquired along the route.

CEI also sought a permit from the village to cross certain streets with the transmission lines and such a permit was issued by the then mayor. At that time the company planned to energize the line at only 33 kv to provide relief to its existing overloads in the Mayfield area. However, the present construction is essentially the same as originally proposed.

In 1971, the plans for the proposed substation were submitted to the village for review by the village engineer. There were no requests for additional plans. The village engineer did suggest that the fence be covered with vinyl.

The record is not clear as to why, but a controversy arose over the construction of the transmission line itself. The village enacted an ordinance requiring underground construction. CEI contends that such construction would increase the cost from $400,000 a mile to $2,140,000-$2,750,000 a mile or $4,500,000-$6,100,000 in the village of Mayfield without considering the termination structures which would add another million dollars to the cost.

The village then raised the question of the substation

location and its plans and enacted or amended ordinances affecting the construction of the project; thereupon, CEI instituted an action against the village of Mayfield to declare certain ordinances unreasonable etc., as well as seeking injunctive relief.

CEI brought this action on August 7, 1974, seeking:

"(1) A declaration that certain ordinances of the village of Mayfield were unreasonable local regulations in conflict with Revised Code Section 4905.65 (the Ohio "Hot Wires Act"), which authorizes CEI to construct its Lark Transmission Line, together with its appurtenances thereto, in and through the village of Mayfield;

"(2) A declaration that CEI is not required to obtain additional permits, permissions, or other consents from the village of Mayfield or its officials or, alternatively, that the village or any proper official be required to issue any permits which may be required; and

"(3) A preliminary and permanent injunction against the village of Mayfield and its officers, agents and employees enjoining them from interfering with CEI's construction and operation of the Lark Line and its appurtenances, including the Lark Substation, in and through the village of Mayfield."

On September 5, 1974, the village of Mayfield filed its answer to the complaint asserting, among other defenses, that CEI failed to exhaust its administrative remedies, failed to obtain from the village of Mayfield certain building permits and permits for the cutting or removing of trees as required by law, and failed to obtain the consent of the village to construct a transmission line through the streets within the village of Mayfield.

On November 12, 1974, intervenor, the third party defendant-appellant Aintree Park Homeowners Association, Inc., filed a cross-complaint which asserted that the zoning variance issued by the Board of Zoning Appeals of the village of Mayfield on November 9, 1970, expressly authorizing the use of certain land within the village of Mayfield by CEI as an electrical substation, was without legal justification and invalid.

The action was tried to the court without a jury in June of 1975. On January 15, 1976, the trial court entered a judgment in favor of CEI, finding that from all the evidence the requirements of R. C. 4905.65(B), the "Hot Wires Act," were fully satisfied. The court declared that CEI was not required to obtain additional permits, permissions or other consents from the village and it enjoined the village from interfering with the construction and operation of the Lark Line, including the Lark substation. The court held that the Aintree Park Homeowner's Association, Inc., and members of the class which it represented lacked standing to attack the November 9, 1970, use variance granted by the village of Mayfield Board of Zoning Appeals.

On January 20, 1976, the village of Mayfield filed a request for separate findings of fact and conclusions of law, pursuant to the provisions of Civil Rule 52. The findings of fact and conclusions of law were journalized on March 31, 1976.

The village of Mayfield filed its timely notice of appeal from the trial court's judgment on February 13, 1976. Aintree Park Homeowner's Association filed a timely notice of appeal as well. Both appeals have been consolidated herein.

The village of Mayfield, in Case No. 36074, assigns five errors, the first three of which will be treated jointly with assignment of error 1 of Aintree Park, in Case No. 36070.

The village of Mayfield assigns as error:

"1. The court's finding that the requirements of Ohio Revised Code Section 4905.65(B) were fulfilled by the plaintiff-appellee is contrary to the weight of the evidence.

"2. The Court's declaration that the plaintiff-appellee is not required to obtain permits, permission or consents from the village of Mayfield or any of its officials is contrary to law.

"3. The Trial Court's judgment enjoining the defendant-appellant from interfering with the plaintiff-appellee's construction and operation of the proposed transmission

line and proposed substation is contrary to law and against the manifest weight of the evidence."

Aintree Park assigns as error:

"The Court's decision below was based upon a finding of compliance by the Appellee, The Cleveland Electric Illuminating Company, of the requirements of Ohio Revised Code Section 4905.65(b), the so-called "Hot Wires Act." The Court below erred as a matter of law in holding that compliance with such statute relieves the said appellee from compliance with lawful municipal requirements for permits and consents authorized to be required by the statutes of Ohio.

This case brings into focus R. C. 4905.65, known as the "Hot Wires Act." It provides the following:

"(A) As used in this section:

"(1) 'Public utility' means any electric light company as the same is defined in Sections 4905.02 and 4905.03 of the Revised Code.

"(2) 'Public utility facility' means any electric line having a voltage of twenty-two thousand or more volts used or to be used by an electric light company and supporting structures, fixtures, and appurtenances connected to, used in direct connection with, or necessary for the operation or safety of such electric lines.

"(3) 'Local regulation' means any legislative or administrative action of a political subdivision of this state, or of an agency of a political subdivision of this state, having the effect of restricting or prohibiting the use of an existing public utility facility or facilities or the proposed location, construction, or use of a planned public utility facility or facilities.

"(B) To the extent permitted by existing law a local regulation may reasonably restrict the construction, location, or use of a public utility facility, unless the public utility facility:

"(1) Is necessary for the service, convenience, or welfare of the public served by the public utility in one or more political subdivisions other than the political subdivision adopting the local regulation; and

"(2) Is to be constructed in accordance with generally accepted safety standards; and

"(3) Does not unreasonably affect the welfare of the general public.

"Nothing in this section prohibits a political subdivision from exercising any power which it may have to require under reasonable regulations not inconsistent with this section a permit for any construction or location of a public utility facility proposed by a public utility in such political subdivision."

The first question we face is whether the public utility facility (I-271 line, a. k. a. Lark Line) is necessary for the service, convenience or welfare of the public served by the public utility in one or more political subdivisions *other* than the village of Mayfield.

The village urges that "as of the trial of the instant action, there has been no construction in any municipality adjacent to the village of Mayfield with respect to erecting any portion of the transmission line to be connected with the line within the village of Mayfield."

The record is replete with evidence that many other political subdivisions are in need of this service and convenience and are included in the project. In the words of Henry Caruso, a senior planning engineer of CEI:

"The municipalities involved in the I-271 line include the municipalities along the lines and the municipalities on either side of the line. I could recite from memory, starting with Willoughby, Willoughby Hills, Wickliffe, Mayfield, Mayfield Heights, Warrensville Township, Pepper Pike, Beachwood, Warrensville Heights, Bedford Heights and the municipalities alongside. Richmond Heights, Gates Mills, North Randall, you look at the map, it is a broad swap that the construction of this line will impact either by serving those customers directly from lines from the substations on this line or by relating (*sic*) substations in either side which are overloaded which will be overloaded in the time period that this line is needed."

We hold that the finding of the Court that the Lark

Line is necessary for political subdivisions other than the village is amply supported by the evidence.

The next question is whether the Lark Line and substation are to be constructed in accordance with generally accepted safety standards.

That the facilities will be built to meet the requirements of the National Electric Safety Code (NESC) is supported in the record. The NESC has been promulgated by the National Bureau of Standards and accepted as a safety standard by the Ohio Public Utilities Commission (Adm. Order No. 72), as well as by numerous states. The Supreme Court of Ohio has termed it "nationally known and nationally recognized by electrical engineers as authority in the erection and maintenance of equipment for transmission and distribution of electrical energy." *Hetrick* v. *Marion-Reserve Power Co.* (1943), 141 Ohio St. 347, 358.

We therefore conclude that the facility will be constructed in accordance with generally accepted safety standards.

The third question is whether the construction of the Lark Line and Lark substation at the northeast corner of I-271 and Wilson Mills Road unreasonably affects the welfare of the general public.

The village contends that the location of the proposed substation at the intersection of I-271 and Wilson Mills Road will unfavorably affect the overall village planning. Appellant urges that a better location would be in the Beta Industrial Park which CEI estimates would cost at least an additional $400,000 and not be as advantageous as the location chosen.

To understand the background of CEI's selection of this site, we find the following undisputed testimony of Albert T. Schafer (CEI Engineer) regarding the selection of the proposed site on the corner of I-271 and Wilson Mills Road:

"And also it was suggested by them (village) that we get a variance for this location for a substation and all of these things put together, the suitability of the property, it was level, it had everything we needed. It was close to

the road. It made it economically feasible and it was just the right kind of property that we needed for a substation and everything fell into—in line."

Additionally the following colloquy took place during the testimony of Mr. Henry Caruso (senior planning engineer—CEI) on cross examination regarding the proposed location of the substation:

"Q. In your planning experience, what is your opinion that the location of the proposed substation would be better suited in the industrial park where it is zoned for industrial purposes as opposed to on the corner of I-271 and Wilson Mills Road? * * *

"A. I think that it belongs right where it is.

"Q. And why is that?

"A. Because of the existing use of the area as a transmission corridor. You will follow the I-271 and Wilson Mills intersecting the transmission of vehicle corridors. The substation has to be where the transmission line is. That's along I-271 and its output has to go along streets that serve customers. That's Wilson Mills.

"So from my point of view, the closer you could get to Wilson Mills, and knowing the area and knowing what is there, in my planning experience, no, it shouldn't be north of that."

In line with the suggestion of the village, the variance to allow CEI to build a distribution substation in the area classified as Motorist Service was filed with the Board of Zoning Appeals under authority of Section 21 of the Comprehensive Zoning Code (Ordinance 159), to wit:

"Where there are practical difficulties and unnecessary hardships in the way of carrying out the strict provision of the ordinance (No. 159) the Board of Zoning Appeals shall have power in a specific case to vary any such provision in harmony with the general purpose and intent so that the public health, safety and general welfare may be secured and substantial justice done."

On November 9, 1970, the board adopted a resolution which recited in part:

"And whereas the use contemplated by the Cleveland

Electric Illuminating Company is for public benefit, will not increase traffic, and will not endanger or damage other property in the village, and the granting of the variance sought is in harmony with the general purpose and intent of the Zoning ordinances, so that the public health, safety and *general welfare* will be secured and substantial justice done.

"Now, therefore be it resolved * * * that the application for variance to permit the use of * * * for an electric substation be hereby granted." (Emphasis added.)

Of interest is the admission of counsel for the village, as follows: "The village is not attacking the variance at all in this lawsuit, and in our answer, pleadings or motions. * * * "

Based on the record, including the resolution of the Board of Zoning Appeals "* * * that the granting of the variance sought is in harmony with the general purpose and extent of the zoning ordinances, so that * * * general welfare will be secured," we hold that the construction of the Lark Line and substation, as proposed by the company and as initially recommended by the village, does not unreasonably affect the welfare of the general public.

Accordingly, we overrule assignment of error 1 of the appellant village of Mayfield.

R. C. 715.27, insofar as it is pertinent, provides:

"Any municipal corporation may * * * regulate the construction and repair of wires, poles, plants, and all equipment to be used for the generation and application of electricity."

R. C. 4933.16, in part, reads:

"No person or company shall place, string, construct, or maintain a line, wire, fixture, or appliance of any kind to conduct electricity for lighting, heating, or power purposes through a street, alley, lane, square, place, or land of a municipal corporation without the consent of such municipal corporation.

"The prohibition extends to all levels above or below the surface of such public ways, grounds, or places, as well as along their surfaces * * *."

The last sentence in R. C. 4905.65 states:

"Nothing in this section prohibits a political subdivision from exercising any power which it may have to require, under reasonable regulations not inconsistent with this section, a permit for any construction or location of a public utility facility proposed by a public utility in such political subdivision."

In interpreting this last sentence (R. C. 4905.65), the Supreme Court held, in *Cleveland Electric Illuminating Co.* v. *Painesville* (1968), 15 Ohio St. 2d 125, at 130:

"These sections must be read *in pari materia* and when so read, Section 4933.16, Revised Code, is modified by Section 4905.65, Revised Code, in that a local subdivision now may not prohibit the construction of such lines but, under certain circumstances, may impose reasonable conditions before it gives its consent. For example, if a proposed construction would so interfere with city planning as to affect the general welfare under Section 4905.65(B)(3), Revised Code, the city could refuse its permit."

In light of this holding, that existing laws should be interpreted *in pari materia*, the village insists on compliance with the following local regulations:

(1) *Ordinance 159*, enacted in 1935, creates a comprehensive zoning code.

(2) *Ordinance 763*, enacted in 1962, amended Ordinance 159 to create a production distribution district and includes electrical substations as an approved use.

(3) *Ordinance 764*, enacted in 1962, also amended Ordinance 159 to create a motorist service use.

The above ordinances were in effect in 1970 when the Board of Zoning Appeals granted a variance preferring the construction of an electrical distribution substation in its motorist service district rather than the erection of a gas station. This variance was filed as a result of the suggestion of the village fathers. When it was granted, CEI tailored its plans accordingly, purchased the needed property and obtained rights of way, all at considerable cost.

It is our conclusion that the village cannot now require compliance with a zoning code from which its Board of

Zoning Appeals granted a variance. We hold that a public utility which has a facility which is an intercity and intrastate project, as is the case here, cannot be made to comply with a code from which it previously received relief by the allowance of a variance that precipitated heavy investment by the company to bring needed relief to various communities in that locality.

(4) *Ordinance 780* (amended Ordinance 159) established a height limitation of 35 feet for buildings and structures within the village.

The height of electrical poles is governed by the National Electrical Safety Code. Accordingly, we rule that this local regulation is unreasonable and inconsistent with generally accepted safety standards and hence cannot be enforced on the project.

(5) *Ordinance 726* (adopted 1960) creates a local building code of the Regional Planning Commission. In the scope of its regulations we find that it does not apply "* * * to the public utility towers and poles, mechanical equipment and structures not specifically regulated in the Code." Regional Building Code Section 1601.03.

We find no such specific regulation and we hold this local regulation inapplicable to the undertaking.

(6) *Ordinance 74-28* requires a permit from the village for the removal or destruction of ten or more trees.

The village admits that it is "uncertain" as to how many trees would be removed. Since there is no evidence that ten or more trees would be involved, we are unable to say that the ordinance would come into play.

We are inclined to accept it as a reasonable local regulation not inconsistent with R. C. 4905.65(B). However, we are not called to rule on its application in the absence of evidence that the requisite number of trees would be removed.

(7) *Ordinances 618, 943, 980, 70-7 and 74-48.* These local regulations established an Architectural Board of Review for the purposes of reviewing all plans and specifications for construction.

We hold that the plans and specifications for the

transmission lines are controlled by the National Electric Safety Code. However, the board does have the authority to review the plans and specifications to determine if they comply with the safety standards of the NESC.

(8) *Ordinance 73-11 (1973)* requires underground installation of transmission lines. The village contends that this is a local regulation that reasonably restricts the ''construction, location or use of a public utility facility.''

In *Cleveland Electric Illuminating* v. *Painesville, supra,* at 130-131, the Supreme Court said:

''Section 4905.65, Revised Code * * * places in each political subdivision control over matters which relate strictly to that subdivision but removes from absolute local control matters which relate to intrastate and intercity transmission of high voltage electricity.''

''* * * Section 4905.65, Revised Code * * * excludes from the control of such subdivisions intercity lines constructed with regard to the proper safety standards which do not unreasonably affect the welfare of the general public.''

In light of the evidence that underground installation would increase substantially the cost per mile,[1] we hold the ordinance to be unreasonable as applied to the project.

Furthermore, having held that this facility is an intrastate project constructed with regard to proper safety standards which does not unreasonably affect the welfare of the general public, we conclude that this ordinance (73-11) is unenforceable.

We are reminded that the variance granted on the substation was subject to the approval of the Planning and Zoning Commission[2] and the Architectural Board of Review.[3]

---

[1]From $400,000 a mile to $2,140,000-$2,750,000 a mile or $4,-500,000 to 6,100,000 to the village of Mayfield.

[2]The commission regulates and controls the height, design and location of buildings and structures including landscaping.

[3]The board reviews all plans and specifications for construction including landscaping.

Admittedly, neither of these agencies either granted or denied consent. This lack of approval is due chiefly to the company's unwillingness to comply with local regulations, to wit: the requirement of underground installation and the establishment of a height of 35 feet for all structures. Both of these ordinances have been ruled inapplicable to the project.

In light of our decision that these and other local regulations do not apply to the project, we hold that the approval by the Planning and Zoning Commission and the Architectural Board of Review, insofar as it relates to the substation, not only becomes a reasonable local regulation, but complies with the condition laid down by the Board of Zoning Appeals when it allowed the variance. The company must honor the condition attached to the variance no less than the village must honor its granting of the variance. Therefore, the commission and the board may review the plans for the construction of the substation and the design, as well as the plans, for landscaping and drainage. As a requirement to such approval, neither the commission nor the board can require a change in location, or require compliance with other local regulations that we have held inapplicable, or insist on conditions that will raise the cost so appreciably that it inhibits this intercity and intrastate project as a whole.

We believe that R. C. 4905.65 as interpreted in *CEI* v. *Painesville, supra,* allows the imposition of a reasonable local regulation which has a local effect only and does not affect the line as a whole, or so raise the costs in their entirety as to render impractical the construction of the facility. We believe that the approval by the commission and the board, along the lines described, meets this definition.

Finally, the village contends that the company must obtain its consent prior to stringing or constructing a line or wire through a street or lane (R. C. 4933.16). We hold otherwise. The transmission lines relate to the "intrastate and intercity transmission of high voltage electricity" and thereby are removed from local control.

*Cleveland Electric Illuminating Co.* v. *Painesville, supra.* (However, on the substation, to the extent the ordinances are local in character and do not affect the project as a whole, approval must be obtained from the Zoning and Planning Commission and the Architectural Board of Review.)

As we have pointed out before, R. C. 4905.65 excludes from the control of such subdivision intercity lines constructed with regard to the proper safety standards that do not unreasonably affect the welfare of the general public.

Assignments of Error 2 and 3 of the village of Mayfield and Assignment of Error 1 of Aintree Park are sustained in part and overruled in part. In doing so, we do not exempt the company from posting necessary bond.

Appellant Aintree Park presents as its second assignment of error the following:

"The court below erroneously applied the provisions of the 'Hot Wires' Act to the construction of electrical distribution substations, whereas the said 'Hot Wires' Act applies only to high voltage transmission lines and their appurtenances, but does not apply to such substations."

The definition of "public utility facility" as provided in R. C. 4905.65(A)(2) includes:

"* * * any electric line * * * and supporting structures, fixtures, and appurtenances connected to, used in direct connection with, or necessary for the operation or safety of such electric lines."

The evidence is clear that a substation, more particularly the Lark substation, will take the 132,000 volt bulk distribution power, transform it to 13,000 volts moderate distribution voltage, switch it, and deliver it along customer service lines (usually wooden poles) so that it may be further transformed to 120 volts suitable for home utilization. The substation is an appurtenance connected to and used in direct connection with or necessary for the operation or safety of the electric lines. It is therefore the finding of this court that the Lark substation falls within the purview of a "public utility facility," as defined in the

"Hot Wires Act." The trial court's application of R. C. 4905.65(B) to the Lark substation was proper. This assignment of error is without merit.

Assignment of Error 4 of the village of Mayfield is as follows:

"The Court lacked jurisdiction over the subject matter of the action."

The village maintains that the construction of the Lark line and substation lies within the jurisdiction of the Ohio Power Siting Commission, which was established pursuant to R. C. Chapter 4906. By its very terms the Power Siting Act was made inapplicable to construction which had commenced or would commence prior to October 23, 1974. R. C. 4906.05. Not only does the record support the fact that the construction of this "major utility facility" commenced prior to October 23, 1974, in areas other than the village, but it is also clear that the project was "commenced" within the village of Mayfield itself by the construction of several foundations in the summer of 1974, prior to the critical date. Assignment of Error 4 of the appellant village is therefore overruled.

The village of Mayfield argues its fifth assignment of error as follows:

"The Court failed to comply with defendant-appellant's request for separate Findings of Fact and Conclusions of Law pursuant to the provisions of Rule 52 of the Ohio Rules of Civil Procedure."

Appellant Aintree Park, presents the same issue in its fourth assignment of error:

"The Court below erred in failing to render separate Findings of Fact and Conclusions of Law, upon timely application therefor, although required to do so by Rule 52 of the Rules of Civil Procedure."

These assigned errors contend that the trial court failed to file timely findings of fact separate from conclusions of law pursuant to Civil Rule 52 which prejudiced this appeal. Judgment was entered against the appellants on January 15, 1976. On January 20, 1976, the appellant village timely filed its request pursuant to Rule 52. A no-

tice of appeal was filed by the village on February 13, 1976. The "findings of fact and conclusions of law" were filed by the trial court on March 31, 1976.

The provisions of Civil Rule 52 confer a substantial right upon the parties and impose a mandatory duty upon the trial court. *Cleveland Produce Co.* v . *Dennert* (1922), 104 Ohio St. 149. "Only when a reviewing court can determine, without weighing the evidence, that the appellant has not been prejudiced can it conclude that failure of the trial court to make findings of fact and conclusions of law was harmless error." *St. Paul Fire & Marine Ins. Co.* v. *Battle* (1975), 44 Ohio App. 2d 261, at 267. In all other cases such failure of the trial court constitutes prejudicial error. *See also Orlow* v. *Vilas* (1971), 28 Ohio App. 2d 57.

After a full review of the pleadings, record, transcript of proceedings, and exhibits in this case, we are able to conclude, without weighing the evidence, that the appellants were not prejudiced by the failure of the trial court to file its findings of fact and conclusions of law until March 31, 1976. Moreover, the village in its oral argument on this appeal conceded that the filing of findings of fact and conclusions of law on March 31, 1976, was not detrimental since the appellant village had an adequate opportunity to raise the issues in its reply brief. Assignment of Error 5 of the village of Mayfield and Assignment of Error 4 of Aintree Park are therefore overruled.

Aintree Park's third assignment of error reads as follows:

"The Court below erred in holding this Appellant, admitted by the Court below, upon agreement of the parties, to the action as the representative of a class of affected residents whose homes adjoin the proposed power line had no standing to contest a variance to construct an electrical distribution substation illegally granted by the Board of Zoning Appeals of Mayfield Village."

Aintree Park Homeowner's Association, Inc., was permitted to intervene in this action as a third party defendant and as a representative of a class of affected residents of

Aintree Park answering the complaint of CEI and filing a cross-complaint against the village of Mayfield challenging the November 9, 1970, grant of a use variance on the site of the proposed Lark substation. The trial court, by its final judgment entry, determined that Aintree Park lacked standing to attack the variance granted by the village of Mayfield Board of Zoning Appeals.

After hearing the evidence at trial the court found as fact that Aintree Park and members of the class which it represents do not own any property contiguous or neighboring to the Lark substation site, nor will they suffer any special damage by virtue of the construction of the Lark substation, at the northeast corner of Wilson Mills Road and I-271 in the village of Mayfield. As a conclusion of law, the court therefore determined that Aintree Park lacked standing to challenge the actions of the village of Mayfield.

The law is quite clear. R. C. 713.13 provides in full, as follows:

"No person shall erect, construct, alter, repair, or maintain any building or structure or use any land in violation of any zoning ordinance or regulation enacted pursuant to sections 713.06 to 713.12, inclusive, of the Revised Code, or Section 3 of Article XVIII, Ohio Constitution. In the event of any such violation, or imminent threat thereof, the municipal corporation, *or the owner of any contiguous or neighboring property* who would be especially damaged by such violation, in addition to any other remedies provided by law, may institute a suit for injunction to prevent or terminate such violation." (Emphasis added.)

The evidence at trial amply demonstrated that none of the members of the class represented by Aintree Park Homeowners Association, Inc., own property contiguous to the proposed substation. No resident of Aintree Park borders on Wilson Mills Road. Aintree Park is also separated from I-271 by Beechers Brook Drive, whose residents had given or directly sold transmission line easements to CEI. See *Brooks* v. *Cook Chevrolet, Inc.* (1972), 34 Ohio App. 2d 98, 109.

Even if it were found that the association would qual-

ify as an owner of neighboring property, the evidence presented at trial was undisputed that no resident of Aintree Park will suffer any diminution in property value as a result of the construction of the Lark substation—let alone any damage different from that suffered by the residents of the village of Mayfield. It is therefore clear that none of the residents of Aintree Park would be "especially damaged" within the meaning of R. C. 713.13 to establish his right to challenge the use variance. *McVey* v. *Reichley* (1957), 105 Ohio App. 319; *Brooks, supra.*

Moreover, we are unable to see how the variance was illegally granted by the Board of Zoning Appeals since it based its decision "that the public health, safety and welfare may be secured and substantial justice done." It is true that no notice was given at the time that the board acted, but notice was not then required, although the board had the authority to adopt rules and regulations "as they deem[ed] necessary." The fact that the board had authority but did not use it is an exercise of a prerogative that the city council gave the board.

Finally, appellant Aintree urges that the Board of Zoning Appeals is an appellate agency and that its action was wholly invalid because it was not granted upon an appeal from a decision of the building inspector. We disagree.

To rule that an approval of a variance is lawful only after a hearing is conducted in which someone objects to the granting of the variance is to hold that a variance can never be given where there is no objection to it. We reject that theory.

The finding of the trial court on the issue of the standing of Aintree Park to contest the November 9, 1970, grant of a use variance for the site of the proposed substation is sustained. Assignment of Error 3 of appellant Aintree Park is therefore overruled.

*Judgment affirmed in part and reversed in part.*

Corrigan, P. J., and Patton, J., concur.