374

CLEVELAND ELECTRIC ILLUMINATING CO., APPELLEE, *v.*
CITY OF LAKEWOOD, APPELLANT.

(No. 80-245—Decided December 30, 1980.)

*Messrs. Squire, Sanders & Dempsey, Mr. James H. Woodring, Mr. Alan D. Wright* and *Mr. Donald H. Hauser,* for appellee.

*Messrs. Hahn, Loeser, Freedheim, Dean & Wellman, Mr. James B. Davis, Ms. Deborah A. Coleman, Mr. Stephen J. Knerly, Jr.,* and *Mr. William E. Blackie,* director of law, for appellant.

DOWD, J.   Three issues must be determined by this court. First, does the Freedom substation fall within the definition of

"public utility facility" contained in R. C. 4905.65(A)(2). If the answer is in the affirmative, then, second, does Freedom meet the three tests contained in R. C. 4905.65(B). If it does, then we must determine how much, if any, regulation is permitted the city by the last paragraph of R. C. 4905.65(B).

The appellee, CEI, argues that the first issue should not be considered by this court, as it was not raised by the appellant in the courts below. The appellant contends, with much justification, that it would have been useless to argue against the inclusion of Freedom within R. C. 4905.65(A)(2) prior to the cause reaching this court, given the holding of the Court of Appeals for Cuyahoga County in *Cleveland Electric Illum. Co.* v. *Mayfield* (1977), 53 Ohio App. 2d 37. Additionally, the city points out that no additional facts were required to be proved to support its contention, and that the argument was fully presented to the Court of Appeals herein in the brief *amicus curiae* filed by the cities of Bedford, East Cleveland and Shaker Heights.

Given the importance of this issue, and the failure of the appellee to demonstrate any harm which it has suffered, we determine that the appellant's argument should be considered by this court, under the discretion allowed us by R. C. 2505.21. See *State* v. *Juliano* (1970), 24 Ohio St. 2d 117, 120.

R. C. 715.27 and 4933.16 are examples of methods by which a municipality may impose reasonable regulations upon the actions of a utility within its borders. Modern utility companies, however, are large concerns, operating on a regional scale. This requires centralized generating facilities, and extensive distribution networks, cutting across the borders of many municipalities. Recognizing the difficulties which might be encountered by a power company having to satisfy the requirements of each municipality through which its distribution lines must pass, the General Assembly of this state adopted R. C. 4905.65, commonly known as the Hot Wires Act.

R. C. 4905.65 provides an exemption to certain "public utilit[ies]" from most "local regulation[s]" where those regulations would serve to impede the construction of a project which falls within the definition of a "public utility facility,"

where that facility meets the three tests set out in R. C. 4905.65(B).[1]

We thus consider the first question presented by this case, namely, the applicability of the definition of "public utility facility" to the Freedom substation. We find Freedom to fall within this definition. It is to be directly connected to the Clague-Edgewater-Fremont transmission lines, a major trunk line presently operating at 33 KV, but designed and planned to ultimately transport current at 132 KV. This transmission line, then, is an "electric line having a voltage of twenty-two thousand or more volts."

Also coming within this definition are any "supporting structures, fixtures, and appurtenances connected to, used in direct connection with, or necessary for the operation or safety of such electric lines." R. C. 4905.65(A)(2).

The role of a substation such as Freedom in the CEI system is to serve as the link between the high voltage

---

[1] R. C. 4905.65 provides:

"(A) As used in this section:

"(1) 'Public utility' means any electric light company, as the same is defined in sections 4905.02 and 4905.03 of the Revised Code.

"(2) 'Public utility facility' means any electric line having a voltage of twenty-two thousand or more volts used or to be used by an electric light company and supporting structures, fixtures, and appurtenances connected to, used in direct connection with, or necessary for the operation or safety of such electric lines.

"(3) 'Local regulation' means any legislative or administrative action of a political subdivision of this state, or of an agency of a political subdivision of this state, having the effect of restricting or prohibiting the use of an existing public utility facility or facilities or the proposed location, construction, or use of a planned public utility facility or facilities.

"(B) To the extent permitted by existing law a local regulation may reasonably restrict the construction, location, or use of a public utility facility, unless the public utility facility:

"(1) Is necessary for the service, convenience, or welfare of the public served by the public utility in one or more political subdivisions other than the political subdivision adopting the local regulation; and

"(2) Is to be constructed in accordance with generally accepted safety standards; and

"(3) Does not unreasonably affect the welfare of the general public.

"Nothing in this section prohibits a political subdivision from exercising any power which it may have to require, under reasonable regulations not inconsistent with this section, a permit for any construction or location of a public utility facility proposed by a public utility in such political subdivision."

transmission lines and the distribution system that actually takes the power into homes and businesses. The distribution system which Freedom would tie into presently operates at about 4 KV, with a plan to step up this voltage to 13 KV in the near future. Freedom's function, then, is to take the high voltage power brought to it by the transmission line, step down the voltage, and pass the power along to the already existing local distribution system.

The city argues that Freedom does not fit into any of the three additional categories described in R. C. 4905.65(A)(2). We agree with the appellee, however, in viewing the substation as being "used in direct connection with" the exempted transmission line. As indicated above, Freedom is the vital first step in taking the power off the transmission line and transforming it into a usable form. In this way, also, Freedom is "necessary for the operation***of such electric lines." R. C. 4905.65(A)(2). Thus, the substation in question does meet the tests set forth for a public utility facility in R. C. 4905.65(A)(2).[2]

Having determined Freedom to be a public utility facility, we next rule upon the question of whether it meets the tests set forth in division (B) of R. C. 4905.65,[3] which, by its terms, would provide the appellee with an exemption from local regulation. The trial court found that Freedom was to be constructed in compliance with all three of the conditions set forth in division (B). The Court of Appeals affirmed this finding, stating that this was a factual matter, and that the trial court, acting as the trier of fact, had resolved the matter in a way that a reasonable mind could have, citing *Cleveland Electric Illum. Co.* v. *Scapell* (1975), 44 Ohio App. 2d 13, 18.

Our review of the record brings us to the same conclusion. We find that a court must take into account the secondary uses of a substation in making this determination, as well as its primary purpose. There is much testimony regarding the necessity of Freedom both to alleviate the overloads of substations serving other municipalities, and to serve as a backup source of supply to at least one existing substation which pro-

---

[2] See *Cleveland Electric Illum. Co.* v. *Mayfield* (1977), 53 Ohio App. 2d 37, 51-52.

[3] See fn. 1, *supra.*

vides power to residents of both Rocky River and Lakewood. With regard to the last two tests of R. C. 4905.65(B), there appears to be no dispute that the station will be built in conformance with the strictest standards of the industry, nor that the station will have anything but a positive overall effect on the welfare of the general public.

We thus arrive at the question of the extent to which a municipality may regulate a public utility facility which meets the tests incorporated in R. C. 4905.65(B). A careful reading of division (B) reveals that no such facility is totally exempted from local regulation. As is evident from the last paragraph of R. C. 4905.65(B), a municipality or other political subdivision may require a permit regulating the construction or location of a facility. While the subdivision cannot hope to prevent the construction of a facility which meets the three tests contained in R. C. 4905.65(B), the General Assembly did intend that the subdivision have some input into the parts of the project that can be said to relate strictly to that subdivision. See *Cleveland Electric Illum. Co.* v. *Painesville* (1968), 15 Ohio St. 2d 125, 130.

This necessarily implies that the utility apply for the necessary permits and make a sincere attempt to comply with the regulations of the political subdivision in which it is trying to build. If the two sides cannot reach an agreement, then the utility has the option of resorting to the courts.

Such a solution is to be applied prospectively only. Given the long history of this litigation, and the extensive consultation and negotiations which the parties engaged in prior to its filing, we decline to order the appellee to do formally what it has already sought to do on an informal basis.

The judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

W. BROWN, P. BROWN and HOLMES, JJ., concur.

CELEBREZZE, C. J., SWEENEY and LOCHER, JJ., dissent.

CELEBREZZE, C. J., dissenting. I agree with the majority that R. C. 4905.65 was enacted in recognition of the fact that utilities must be allowed to use centralized generating facilities and extensive distribution networks which transverse many

municipalities. Such use is made practical when some limitation is placed on local control.

All electrical transmission equipment is interrelated and in some sense a necessary element of the entire system. The goal of the system is delivery of power to vast numbers of consumers. In order to transmit the amount of power necessary, many utilities use high-voltage lines. The power from these lines must be stepped down to a lower voltage and then channeled through lower-voltage lines in order to get to the consumers. In a sense, then, all elements of this system are necessary for the operation of the system's high-voltage lines.

It is not necessary or desirable, however, to limit local control of all elements of the system. Consequently, the General Assembly used restrictive language in defining public utility facility to include electric lines carrying 22,000 volts or more "and supporting structures, fixtures, and appurtenances connected to, used in *direct* connection with, or *necessary* for the operation or safety of such***lines." (Emphasis added.) This language was used in recognition of the fact that at some point, a facility has such a significant impact on an individual community that total local control is desirable.

The General Assembly determined that high-voltage lines and their supporting structures place a slight burden on many communities and provide a great benefit to the general public and as a consequence clearly included such lines in the definition of public utility facility. The legislature also determined that local transmission lines provide a highly localized benefit and so should not be partially exempted from local regulation. In order to determine whether the General Assembly intended to grant substations such as the Freedom substation a partial exemption from local regulation, it is appropriate to assess the nature of the burdens and benefits created by such a facility.

The Freedom substation provides a much more localized benefit than a high-voltage line; normally such a substation provides electricity to a small number of communities in its immediate area. The impact created by such a substation is local; such substations occupy a place in an individual community and can, particularly if a rural design is used, severely alter the environment in which they are constructed. As a consequence I disagree with the majority and would hold that substations

such as the Freedom substation are not within the term "public utility facility."

Even if such substations are within the definition of public utility facility, I do not believe that the Freedom substation qualifies for a partial exemption from local control under R. C. 4905.65.

R. C. 4905.65(B)(1) states that a partial exemption will be granted only if the facility "[i]s necessary for the service, convenience, or welfare of the public served by the public utility in one or more political subdivisions other than the political subdivision adopting the local regulation."

In the case at bar, testimony revealed that the power provided from the Freedom substation would go to Lakewood customers only. The majority states that secondary uses of the substation must be accounted for and that, because the substation is necessary to alleviate overloads of substations serving other municipalities and to serve as a backup for another substation serving Rocky River as well as Lakewood, it fulfills the requirements of R. C. 4905.65(B)(1).

It is difficult to conceive of any substation which, due to the interdependence of the elements of the transmission system, does not in some secondary manner act as a backup for substations serving other municipalities. The majority's analysis renders the requirement of R. C. 4905.65(B)(1) a nullity and as a consequence can not parallel the legislative intent in enacting the statute.

For the foregoing reasons, I respectfully dissent.

SWEENEY and LOCHER, JJ., concur in the foregoing dissenting opinion.